Okay, please proceed. May it please the court, Liam Sherlock for North Cascades Conservation Council as the plaintiff appellant in this matter. This morning I will focus my arguments on the TWSP, the 26 or 24,000 acre TWSP logging and restoration project. I will address primarily the Forest Service's reliance on the condition-based management as well as the lack of public opportunity for public comment on the revised EA that followed the Cedar Creek fire which affected the project area. The project's use of condition-based management, which is a somewhat new concept in the Forest Service, combined with its lack of monitoring strategy eliminates effectively any meaningful analysis of the project's direct, analysis is especially deficient because of the final EA's omission of an analysis that links this project to what was originally part of a larger 77,000 acre project that was effectively bifurcated following the Creek fire that occurred in this forest in the vicinity of this project. The use of the condition-based management fails to adequately inform the public as well as the scientific community of both the direct and the indirect and the cumulative impacts because it renders the actual effects speculative and it relies on this sort of maximum effects analysis to take into account but that fails to take into account exceptions such as like disease or mistletoe infection that could definitely expand the scope of the impacts of this project in ways that weren't in statute and mandates full analysis and disclosure of a project's direct and cumulative effects and this analysis has to be comprehensive not only looking at the current but also the past and future projects as set forth under 40 CFR 1502. And this hard look that NEPA requires requires a detailed quantified and site-specific analysis and not just a broad brushed approach which is frankly what has happened in this twist project proposal. Council can I ask you a question about the midnight project because it's really hard for me to tell from the record really how far along that project was. I'm trying to figure out when a project that's being contemplated cross the line into being far along enough to be included as part of the cumulative effects analysis. I mean here there was a study and report but as the final EA noted they were still studying that issue and the project hadn't been scoped as I understand it and so the final EA basically said that if there were going to be action taken that would be part of a new project that was going to be initiated. So can you help me with that question in terms of where our case law stands? Hold on for one second. I'm hearing a sound. Is that somebody's cell phone? I guess it's a mystery sound so let's forget that and council can proceed to answer Judge Wynn's inquiry. Thank you your honor. Yes Judge Wynn, the Forest Service absolutely knew about the midnight project. The midnight project was effectively one in the same as the twist project until this fire occurred and in fact the Forest Service itself conceded at excerpt of record 1344 that the midnight is simply the area left behind from the original twist restoration. I think that part is not being disputed. They knew about it. The fire really sort of changed the scope of the entire project right so now they're basically going to carve out a good piece of it. Our case law says that it doesn't have to, I mean the project doesn't have to be finalized to include it but if it's only merely being studied or contemplated then it does not have to be included as part of the cumulative effects analysis. That's how I understand it and so I'm trying to figure it out here. It seemed like they were still studying the issue and hadn't really scoped the project. There was an anticipation that perhaps they would do a project but I don't see that they were very far along. Can you address that? Yeah I mean the draft EA did include the midnight project. So I mean effectively it was one in the same and the Forest District Ranger overseeing the twist project admitted months before the the FONSI, the finding of no significant impact, and the final EA for the twist project that the midnight project was likely to move forward and we've cited that in our briefs which is documented in the record. So midnight was more than mere contemplation and it was highly likely to succeed and in fact has but there is no data or reports relating to it as part of the final EA and this relates to the failure to allow for additional public comment Judge because you know clearly this was an original 77,000 acre project and now it's been bifurcated and segmented into two projects and this kind of divide and conquer approach to NEPA compliance is simply not allowed. The Thomas V. Peterson case being the kind of the first the first definitive ruling by this court on that issue where the court held that you know the central purpose of NEPA is to force consideration of environmental impacts in the decision-making process and that requires that that this process be integrated with agency planning at the earliest possible time and that simply did not happen here where the cumulative effects which were very highly foreseeable that the midnight project would proceed coupled with the failure of the agency to reopen the comment period for the twist project following the fire and allow for both the public and the scientific community to weigh in on the advisability of eliminating midnight the midnight project as well as failing to look at how that fire may have implicated or changed the analysis given that this good when the purpose and need of this project in part was to try and minimize the fire impacts on the forest environment and so by not only failing to allow for reopening the comment period following the fire and the the arbitrary excising of the majority of that project which was now going to shift to the midnight project didn't allow for a proper and hard look analysis as to what impacts this fire might have had on the on the both the the project planning the scope the how it might have been implicated and therefore what what what has happened here unfortunately is is a is a as I said a dividing conquer approach where the midnight project was was far enough along given that it already been subject to fairly significant analysis under the original draft ea and so for the forest service to say it's just it was just speculative um simply isn't isn't true I mean again the district ranger uh said himself that that it is likely to proceed and that was that preceded the the issuance of the fonzie uh and and the the final ea so I hope I've been answered the court's question but I mean I it's it's it's just simply not fair to the public and it's certainly not consistent with the NEPA requirement to look at reasonably foreseeable uh that doesn't mean it's it's absolutely going to happen but it is reasonably foreseeable um and especially since this this action followed the um the the significant impacts of the fire uh again which is which was a great opportunity for the forest service to take a hard look at what you know what what what uh patterns fire patterns may have um occurred that they could then inform the agency as to how to adjust or or potentially uh mitigate what what the intent the intent of this project was in the first place which is to try and uh lessen or or uh avoid the interface um between the human environment and the forest environment can I interrupt for just a minute you're in the the argument is well we have an ea then we have the fire we now have a much smaller project that we're analyzing what are the differences in your view that are now on the ground that require some sort of a new evaluation I mean this I know you've been talking about this but if you could do this in kind of summary form so so what difference do we now have in front of us that's not properly analyzed in the ea that they've stuck with or that they've stayed with I should say uh they precisely the the point your honor um the the fact that the uh once the fire occurred that would have uh provided a an excellent opportunity to reopen the ea for additional public comment so the so fact of the fire itself is a new factor absolutely yeah yeah I mean this this whole this whole project ostensibly is to for habitat restoration and and armoring the forest if you will against fire impacts as as the climate is is changing and uh you know and the human the wild lands interface uh as far as uh homes and and whatnot um is is encroaching so here we have now boom we've got a fire uh in this exact immediate area and this is a great opportunity to say well how did this fire occur what where was its uh what was the scope of this are the ways that we could we could repurpose or reconstruct some of the assumptions that we've made yeah okay I got that part so put that one on the on the shelf for a minute is the area that's now being analyzed the reduced area put inside the fire question is it significantly different from the larger encompassing area that they were doing before that if you were analyzing only the narrow area that we're now talking about that the ea should be different they the the ea did did accommodate the particular they haven't changed the the they haven't expanded or altered the 24,000 acres um outside of the original proposal in other words it's it's still part of that original 77,000 acres um that was originally the twist project so but because well I mean if you want to leave aside the fire uh consequences then well we're just putting it to one side for the moment I'm not going to ignore it yeah sure sure uh so well they they did they did uh I think to answer your question they have done the analysis for the 24,000 acres as part of the original uh analysis I concede that um but they did not in the final ea uh take into account the the comments by the public again on as to the direct and indirect effects of the fire and how that might have informed a revised ea in a way that that actually adhered to the the tenets of of NEPA is that I mean I'm that's helpful I have I have a couple of questions for you also if Judge Fletcher one of the questions I have from what you opened with in your argument is it the position of of your client that Forest Service acting based on this conditions-based management premise is going to always be flawed and require a remand for another look uh we're we're not we're not necessarily challenging conditions-based management um as it applies across the board for the Forest Service your honor but certainly in in this case we are challenging its application um to the to the to the proposal as as as altered by the agency um following the Cedar Creek fire it simply is is not it relies on this maximum effects analysis which fails to capture the full scope in part because it neglects exceptions of such as tree removal under certain conditions like mistletoe infections where there's really no monitoring uh as to how how if if you know they can cut up to 25 inch diameter trees that may have a spring of mistletoe in them but there's no effective monitoring as to how how that's going to affect the total uh impact to the forest given that those are the large often the larger trees but that's just not considered um in the analysis even under the maximum effects analysis used in the EA and the Forest Service conceded that um and so and that coupled with the lack of monitoring because there's really effect no effective monitoring proposals it's largely left up to the logging crews the private contractors to determine what's actually going on on the ground uh and and and there's a utter lack of site-specific analysis as to what uh what areas are going to be cut in in light of um the large or scope of this project okay so let me ask you another question so is it your position that the court should re vacate and remand for an assessment by the Forest Service using a full environmental impact statement yes your honor we do believe that's probably the case you're given the significant impacts i mean the whole purpose of this well one of the stated purpose and needs of this project is to significantly having a significant effect on the human interface um between the forest and the and the and the urban urban encroaching urban development so if it's not having a significant impact then then it's kind of defeat self-defeating as to what it is stating it it's purpose is however um i think in the course of of the the natural succession or the natural course of how a uh a nipa process is supposed to unfold that remand for a revised and updated and and and legally defensible uh environmental assessment that would would allow for informed um public and scientific community comment in particularly of the cedar cedar creek fire would be the appropriate uh step um because ultimately it's the agency's determination to determine if there's a significant impacts and the issue of fonzie finding no significant impact or or prepare an eis um and and you know we it is a procedural statute ultimately the agency has the discretion to make that substantive determination but it's got to adhere to the process and it did not do that in this case okay thank you so another question i've got is in your experience if we vacate and remand for the agency to reassess the the ea uh how long would that process take and for that period of time would there be a real risk of fire of a wildfire in this forest region i you know i think there's always a risk i mean clearly um but i i believe that that uh reopening the the comment period um wouldn't necessarily take that much longer partly because we've because well the midnight project is moving forward and there have been um comments submitted by by scientists by the plaintiffs uh consultants so i think that a lot of that information could be uh incorporated into a revised comment period on the twist project and then and then those projects analyzed is a total in the totality under the cumulative effects requirement analysis requirement and a lot of the in other words a lot of the information that would be generated in a revised ea both from the public and the scientific community as well as is coming from the forest which has had another well year or two to a couple years to to take a look at what what the impacts of the forest were on on certain forest stands and how perhaps to to uh adjust the twist project in a way that makes the most sense um learning from that from that prior fire okay thank you so so i i think it would probably take a year your honor and i i i think it's worthwhile because we're looking at uh what what a project is slated to to run 20 years okay thank you you've answered my question that the the one year estimate is what i was trying to assess uh but now i with my questions i may have used up all my colleagues time so if if judge fletcher or judge thank you i guess it's all right so your time is used up but for planning purposes we'll give you an extra two minutes for rebuttal thank you judge we'll proceed with the forest service argument and if council for the forest service wants me to tack an extra two minutes time on onto your 20 minutes i would do that i appreciate that we'll see how this goes your honor thank you and thank you your honor sean pedigree on behalf of the appellants your honors the forest service developed a detailed restoration strategy for the okanagan wenatchee national forest in 2012 that strategy explained that decades of fire suppression and other management activities on the forest such as timber harvesting and grazing have resulted in an unnatural homogeneous and unhealthy forest that is subject to severe and intense wildfires as well as insect infestations and disease outbreaks the restoration strategy proposed management activities that would reverse this degradation and move the force toward a more natural heterogeneous and resilient condition that will reduce the severity and intensity of wildfire generally and more specifically within the wild and urban interface and would improve the forest resiliency to insects and disease so the twist restoration project authorizes such activities that were in the restoration strategy in a 24,000 acre project area near twist washington and i think your honors to understand appellants nipa claims and the shortcomings of those claims it's important to be clear exactly how the project was developed and what it authorizes following completion of the restoration strategy and a landscape evaluation of the larger twist area the forest service developed the project by gathering baseline data in the project area to determine which management actions would then move that project area toward the more resilient desired conditions and that baseline can that baseline information consisted of information regarding stand structure forest type and insect and disease vulnerabilities throughout the project area based on existing information some field verification and modeling throughout the project area this is the kind of baseline information that that nipa countenance baseline information can use data from a similar area computer modeling or some other reasonable method and so the forest service then took this baseline information throughout the project area and determined what specific types of activities in its expertise and in its experience and in reliance on the scientific literature would result in improvement of the forest to improve the forest resiliency and reduce the potential severity and intensity of wildfire it determined two activities would do this vegetation treatments and under uh and and excuse me fuel reduction burning within the vegetation treatments there's commercial overstory treatments and non-commercial understory thinning so to finally identify these exact uh activities that would occur and then it identified the precise prescriptions that would apply to those activities so how many trees would be left per acre what types of trees would would be removed how that removal would occur it's called you know thinning from below you're removing the smaller trees until you get to the larger trees whether there would be a diameter cap on the trees that are being removed and then the finally a detailed precisely where within this 24,000 acre project area these types of activities would be authorized there are detailed maps in the record some of which were were excerpted in uh in the answering brief that show where these would be authorized within the project area and then the finally explained that that there would be an implement an implementation period of about three to five years of across three different uh geographic areas within the project area can you counsel help me by explaining uh why the fire especially given the scope of the fire and the carve out of the midnight project didn't just change the whole landscape relatedly necessitate the need for another um notice and comment period i think it's important your honor to understand sort of precisely how how this proceeded there was further public participation following the cedar creek fire so there was a obviously the scoping period early on there were comments received in response to that there was a public open house there was a site visit then there was the draft ea with comments and then between the draft ea and the final ea is when the fire occurred between that time period there was further opportunities for public input at a public meeting that was broadcast uh online materials were provided to the public a representative plaintiff attended that meeting thanked the forest service for the quality and the the the brevity of the information that was provided that the entire purpose of that public meeting was to explain to the public the changes that were made going to be made to the project assessed the proposed action assessed in the final environmental uh assessment and then beyond that and i think this is an important point there was a pre-decisional objection process so further public involvement on the final ea the final ea which accounted for the effects of the cedar creek fire so this final ea which removed the acreage that would have been in the original proposed action in the draft ea was subject to an additional public process could you describe in more detail what happened after that meeting in terms of formal sort of how long was the period how many comments you got i mean give me some more detail if the public meeting occurred in january of 2022 i don't know that there's information in the record reflecting for any submissions of comments in response to that other than the the representative of planet who responded again thanking the forest service for presentation and the quality of the information but but i think you just represented to me that after that meeting there was a period for further comments can you describe to me how long that period was how many comments came in give me some detail on that if you can and i and i don't want to uh mystique i may have been referring to the pre-fired comment period on the draft ea but so we had the the public meeting in january of 2022 and then the final ea was released in april of 2022 after the final ea was released there's a another pre-decisional objection process that the public can participate in and that the plaintiff here did participate in raising every issue eric has not identified any issues it was not able to raise during that process and that is all pre-decisional that is all part of informing the agency's decision as to whether to go forward with the project and as to the the analysis in the environmental assessment and that that pre-decisional process is i believe it's a 30-day process that uh that the public is allowed to submit objections and then there's an objection resolution meeting and then ultimately the final decision and if i could your honor the standard for public participation is whether the agency has provided the public with sufficient environmental information considered in the totality of the circumstances to permit members of the public to weigh in with their views and thus inform the agency decision making process and so that's why i think it's important that the decision had not occurred at the time that there was a public process to assess the analysis in the final environmental assessment that was still all part of the nipa process and i think that that there's a decision that the district court relied on but the parties have not addressed in any real detail in their briefing it's earth island institute versus the u.s forest service 87 f fourth 1054 from 2023 and in that case the court said that the service or the forest service is required to circulate a draft ea based on consideration of new information or change circumstances unless the ea has undergone only slight modifications and this is the key the key languages from its last circulated version so what happened in that case was there was a draft environmental assessment and then there was the comment period and then there was another environmental assessment it's called the revised environmental assessment in that opinion but i think what it actually was was the the equivalent of the final environmental assessment here and then there was the objection period in that case as well it's it's documented in the the court's opinion and then there was a decision that was made and simultaneously with that decision a revised final ea was submitted there was no further public process on that revised final ea and so the inquiry there was were there some changes in that revised final ea that were significant enough to warrant reopening a public comment period because there had been no no period following the revised final ea the court set found that there was not but here we don't have a similar situation the last circulated version is the final ea that is the document that the public had an opportunity to comment on as part of the nipa process and before a decision was rendered by the forest service going to the the midnight project which was before you move to the midnight project can i ask you one more question about that the scope of the project changed quite a bit 69 so is it the forest service position that that's not substantial enough because it's a reduction in the size of the anticipated subject so that's not deemed substantial enough to warrant a new notice and comment period i don't think that's the inquiry here your honor whether it's substantial because there was opportunities for public participation after the fire there was this objection period that both the public meeting and this objection period in which again plaintiff was able to raise any issues that needed to wanted to raise before a decision was made now as to whether a reduction of the the project size by 70 or several thousand acres is a substantial change that to say for example there had been the final ea and it still included that that acreage and then you had the objection process and then you had a revised final ea like in the earth island institute case and in that revised final ea that was the first time they removed the acreage from the cedar creek fire that would be a very different case because there is no opportunity for public comment and public process at that point i think there's still a lot of similarities in the analysis and in the totality of the circumstances there could be an argument that members of the public were allowed to weigh in with concerns and inform the decision-making process because the treatments within the the what ultimately became the 24,000 acre twist project area remained the same in response to the cedar creek fire in other words the uh the the commercial overstory thinning or treatments the the non-commercial understory and the prescribed fire the the prescriptions for all those what the forest service had analyzed in the draft ea remained the same the only the major changes aside from the reduction in the total size was to impose a smaller diameter cap on the the trees that could be removed and that came from comments to the draft ea not in response to the cedar creek fire so i think an argument could be made that there was still looking at the totality of circumstances there was enough information to allow informed decision making and public participation but that's not the case that we have here your honor turning to the to the midnight restoration project um i want to be very clear about what was reasonably foreseeable at the time that the final year was completed and the project was approved it is was i think arguably reasonably foreseeable that some sort of project may have may have been anticipated to move forward but obviously the fire coming through that area changed the circumstances and the forest service disclosed to the public that they were reassessing that area to determine whether it still needed treatments and whether the fire had an effect on the treatments that uh that would be provided and so when you look at the standard for what is reasonably foreseeable uh this is from the league of wilderness defenders versus cannot in 2014 when looking at whether potential future action is an identified proposal courts must focus on a proposal's parameters as the agency defines them as of april 2022 when the final year was finished and later on when the project was approved the midnight restoration what became the midnight restoration project had no proposed parameters the forest service was in the process of determining a should we go forward with the project and thought you know it seemed likely that we'd go forward with some sort of project but we don't know what that the parameters of that project are going to be because obviously things have changed we need to engage go through a process a scoping process to determine the scope of the needs and the scope of a potential project invite public comment on that and eventually determine what the parameters of that project will be this was a pre-scoping uh inchoate project and there's there's no court that i'm aware of that has held such a project is reasonably foreseeable the potential effects of such an inchoate project are reasonably foreseeable such that um their potential effects could be meaningfully analyzed in an environmental document and i think it's important to contrast what the forest service did with the aquatic restoration project that was also part of the original twist project and the forest service following the fire determined that's a project that is should still go forward and implementation of that project was scheduled to begin uh in or around april 2022 close in time to finalization of the final ea and the final ea said we will consider we consider this project in our cumulative effects analyses because the parameters of that project were reasonably foreseeable and that's just not the case with the midnight restoration project and one more point on the midnight restoration project is any project that goes forward will have to consider the effects of the twist project right the twist project is a part of the environmental baseline will be part of a the past and present and reasonably foreseeable projects and effects from those projects that any analysis from the midnight restoration project will have to consider if i could go back to the to again the the scope of the actual project you know it was talking earlier that the forest service identified what types of actions would move the forest towards its more resilient conditions where on the forest those actions would occur the specific prescriptions for those actions and then here's where the condition-based management comes in the forest service acknowledged that the conditions the expected conditions based on the baseline condition may not be exactly as they expected at the time of implementation that can be because of some inaccuracies in baseline information or the fact that forests are living dynamic ecosystems such that when you get to some to a stand of trees one two three four five years after project is approved something may have changed there may have been a bark beetle infestation there may have been a wildfire there may have been something else that occurred and the forest service is merely saying we need flexibility to be able to implement the right treatments in the right places at the right times so if we get to these stands and they don't meet these detailed decision criteria that the forest service has set forth we're not going to implement the the the treatments because they're not going to achieve the goal they're not going to achieve the goal that we're we're seeking to improve the resiliency of the forest we won't do them elsewhere we've shown you all the maximum areas in pond which we will potentially engage in treatments but there is certainly a potential that we're not going to treat every single acre so how did they decide to analyze that in the final environmental assessment they said we're gonna we're gonna assume for purposes of analysis for purposes of informing the public informing our decision making that every acre has been treated a maximum effects analysis and in doing so your honors i think going back to to need his purposes is important it's does that allow the the public to engage uh the forest service and to help promote informed decision making and i i would argue your honor that it goes above above and beyond what's necessary because they're they're being very the first service being very specific uh about what they will do when they encounter the inevitable uncertainty that occurs in a living dynamic ecosystem and they're saying we will do it exactly this way and we're going to now analyze uh the maximum potential effects of doing it that way and your honor i think that's full your honors i think it's fully consistent with uh neva's requirement of providing a reasonably thorough discussion of the potential environmental effects of the proposed action um and in fact aren't as this case is cited in the party's briefing but and it's from the 10th circuit i understand it's only persuasive authority but it is very similar factually and legally to the situation here it's wild earth guardians v 920 f 3d 1245 which involved an e an environmental assessment for a project that approved more than 2 000 acres of clear cutting 6 000 acres of commercial thinning and 6 000 acres of prescribed burning the ea did not specify the treatment locations and instead indicated that 300 to 500 acre areas within the 16 000 acre project area would be identified annually over 10 to 15 years for thinning and clear cutting there the court found that the ea took a hard look at the potential effects on links by assessing the maximum potential effects of the project on links habitat even though it was unknown precisely which areas of the project area would be affected during the course of the project could could you i ask you to backtrack just a little bit as i heard the argument for the other side it is that the for the fact of the fire itself sufficiently changed the conditions on the ground that that requires another ea could you you've responded in part because you respond directly to that again as i understand that's the position on the other side and i'd like to hear your response as responding earlier again we don't believe that's the inquiry because finally it did consider but but with a question your honor the the changes that occurred on the ground to the twist restoration to the project in response to the fire was to sit was to remove the acreage that was potentially affected by that fire so the 24 000 acres that remains in the twist in the twist restoration project um that the analysis in the draft ea remains equally valid for those 24 000 did you learn anything from the fire that you know before there's nothing documented in the record uh discussing that that sort of information again that's information that may be addressed if relevant in the planning process for the midnight restoration uh the midnight restoration project but again we have a final ea that post that so the final year that post dates the cedar creek fire and the final ea analyzes the potential effects of the treatments within the 24 000 acre area using the prescriptions that had been developed and the treatments that the forest service had determined based upon the best available scientific information at that time that would improve the resiliency of the forest and the forest service reasonably determined that these activities still make sense to go forward that's why they issued the final ea they did not pardon me for interrupting i think i'm hearing you say although you've not said directly you didn't learn anything from the fire that you did not already know is that is that what you're telling me i would say that's a more succinct way of saying what i was trying to say your honor but i think that there's nothing in the final ea that indicates something was learned that was not already previously assessed your honors i've said a mouthful here today and i know my time is getting short unless your honors have any further questions i would simply ask that you affirm the judgment of the district court in a century of judgment favor of favor of appellee appellants i have no questions thank you your honors i think that's fine okay now appellant appellants thank you thank you your honor um i first of all just want to take on the public participation um argument by council um a meeting in the evening um where information was provided uh regarding the the revampment of the twist project um does not allow for meaningful participation if you just you're getting all this new information and you're supposed to make um give input that same night um you know it's not even written information it's it's it's it's just unrealistic that that could be considered meaningful public participation as far as adhering to the cfr requirement for full public uh comment period and and relating to that um council you know is saying that there was an opportunity for public participation via the the meeting and then the objection period well the cfrs and nipa and the case law doesn't talk about meaningful public participation via objections to a final ea it talks about providing the public and the scientific community with an opportunity to weigh on on significant modifications uh during a comment period and the comment period is a more informed and and thoughtful process which allows for backing it up with scientific evidence uh and that is just simply not the case when you have an after effect or after the after the fact final ea i mean clearly the agency is going to be a lot less uh likely to change that um in the absence of um it having to revamp that in the the a so the totality um of circumstances in this case uh and the failure of the agency to account for and in any way shape or form that the cedar or fonzi is is is frankly a a significant omission and a failure to adhere to the basic precepts of nipa and for that reason we would ask the a the court remand the agency's decision for a revised ea to account for the significant changes and modifications that uh that clearly happened in the space um that were not accounted for um as required by law okay thank you counsel i'm afraid your extended time is up but we appreciate that this case will now be submitted and the the parties will hear from us in due course uh i thought the arguments on both sides of the case were very helpful to the panel and we will now recess and take a break for 10 minutes and then return for what i think is the final final argument in the geo the geo group case all right
judges: FLETCHER, GOULD, NGUYEN